# UNITED STATES DISTRICT COURT

## DISTRICT OF ALASKA

| | |
|---|---|
| BRADLEY A. HASLETT, ) | |
| ) | |
| Plaintiff, ) | 3:06-cv-00150-JWS |
| ) | |
| vs. ) | ORDER AND OPINION |
| ) | |
| ) | [Re: Motions at Docket 72 and 79] |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |
| _____) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Counter-plaintiff ) | |
| ) | |
| vs. ) | |
| ) | |
| BRADLEY A. HASLETT, ) | |
| ) | |
| Counter-defendant ) | |
| _____) | |

## I.  MOTIONS PRESENTED

At docket 72, defendant and cross-plaintiff United States of America ("government") moves for an order granting summary judgment in its favor and against plaintiff and cross-defendant Bradley A. Haslett ("Haslett") in the amount of

$438,971.35[1] in federal tax assessments plus accrued statutory interest and additions from February 28, 2009, less any payment or credits. Haslett cross-moves for summary judgment in his favor at docket 79 and opposes the government's motion at docket 80. The government replies at docket 81. Neither party requested oral argument, and it would not assist the court.

## II.  BACKGROUND

Winward Electric Services, Inc. ("Winward")  was an electrical contracting company originally formed in 1956.  In 1999, Winward was purchased by and became a wholly-owned subsidiary of a holding company named CommSpan, Inc. ("CommSpan"). CommSpan was created for the sole purpose of acquiring Winward and three other electrical services companies - Aurora Electric, Inc. ("Aurora"), CTS, and CRA-TEK.  At the time of the acquisition, Winward was operated by the following individuals:  James Millerberg ("Millerberg"), who served as CEO; Toby Quesinberry ("Quesinberry"), who served as COO; Paul Jacobson ("Jacobson"), who served as CFO; and Dawn Dauber ("Dauber"), who served as Controller.  Haslett owned and operated Aurora, but did not play a role in the management of Winward.  As a holding company of four electrical services subsidiaries, CommSpan provided management services to the companies it oversaw, and each subsidiary paid management fees to CommSpan in return.[2] CommSpan managed 401(k) plans for the employees of its subsidiaries and ensured that its subsidiaries were covered by appropriate insurance policies.  CommSpan also acted to capitalize its subsidiaries.

As a result of the acquisition, all of the subsidiaries' existing shares were extinguished and its shareholders received CommSpan stock in return.  In exchange for the Aurora acquisition, Haslett received 805,000 of the 5,400,000 issued shares in CommSpan, which represented the fifth largest block of shares outstanding.  Haslett

---

[1]Docket 81 at 7.  As explained in the reply memorandum and supported by affidavit, this sum is updated from the $438,617.57 claimed in the motion at docket 72.

[2]Haslett testified at his deposition that while Aurora always paid its management fees, CommSpan's other entities did not.  Docket 75, Ex. C at 7-8.

remained in control of Aurora and also assumed a role as a director of CommSpan. CommSpan's other directors were Andrew Hidalgo ("Hidalgo") (who also served as CEO of CommSpan) and David Gerber ("Gerber") (who also served as COO and Secretary of CommSpan). On May 27, 2000, CommSpan's Board of Directors, including Hidalgo, Haslett, and Gerber, participated in a telephone conference to discuss Winward's financial difficulties. Also in attendance was Jacobson, Winward's CFO. During the telephone conference, CommSpan's Board members discussed various ways in which Winward's financial situation could be resolved. The course of action ultimately adopted was to cease making Winward's federal tax payments. Jacobson testified at his deposition that prior to making the decision all participants in the call were aware of the personal liabilities associated with a failure to pay trust fund taxes. Nevertheless, the decision was made because it was the "easiest" and would cause only short-term impact. In the meantime, it was agreed that Jacobson would negotiate a payment plan with the IRS.

Because Haslett was only a director at the time, he denies any role in the decision not to pay taxes for June, July, and August 2000, although he admits he attended the May 27, 2000 telephone conference during which the decision was made. According to Haslett, "the officers of Winward [subsequently] failed to make trust fund deposit[s] on the following pay periods in 2000[:] May 24, May 31, June 7, June 14, June 21, June 28, July 4, July 12, July 26, August 2, August 9, August 16, August 23 and August 30." Prior to this period, CommSpan sought to capitalize Winward by other means. In January 2000, Hidalgo and Gerber negotiated and guaranteed a $2.0 million line of credit for the benefit of Winward. Between January 2000 and September 2000, Jacobsen - CFO of Winward - was the only individual to draw down on the line of credit.

On September 29, 2000, Haslett became CEO of CommSpan. On the same day, Haslett obtained and personally guaranteed an increase in CommSpan's line of credit in the amount of $700,000, $300,000 of which was drawn down to pay Winward's

-3-

trust fund taxes.[3]  Haslett claims that, despite "[r]epeated admonishments," Winward's management ignored him and failed to pay its accumulated trust fund taxes on September 30, 2000 and again on December 31, 2001.  Instead, those funds were used to pay other creditors.  Winward and CommSpan collapsed in December 2001.  After Haslett proved unable to save Winward or CommSpan, he took both entities into bankruptcy.  This action and a concurrent action in the District of Utah followed.  The Utah action has been stayed pending resolution of Haslett's claims and the claims against him in this court.

### III.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment should be granted when there is no genuine dispute about material facts and when the moving party is entitled to judgment as a matter of law.  The moving party has the burden to show that material facts are not genuinely disputed.[4]  To meet this burden, the moving party must point out the lack of evidence supporting the nonmoving party's claim, but need not produce evidence negating that claim.[5]  Once the moving party meets its burden, the nonmoving party must demonstrate that a genuine issue exists by presenting evidence indicating that certain facts are so disputed that a fact-finder must resolve the dispute at trial.[6]  The court must view this evidence in the light most favorable to the nonmoving party, must not assess its credibility, and must draw all justifiable inferences from it in favor of the nonmoving party.[7]

---

[3]Docket 75, Exhibit J at 2.  The remaining $400,000 of the September 29, 2000 increase was distributed to CRA-TEK.  Docket 80 at 4.

[4]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[5]*Id.* at 325.

[6]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

[7]*Id.* at 255; *Soldano v. United States*, 453 F.3d 1140, 1143 (9th Cir. 2006) (citation omitted).

-4-

## IV. DISCUSSION

Internal Revenue Code § 6672(a), provides in pertinent part that:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.[8]

This rule has been interpreted by the Supreme Court to apply to persons responsible for the collection of third-party taxes, not only persons who perform all three functions of collection, accounting, and paying.[9]  "In an action to collect taxes, the government bears the initial burden of proof."[10]  That burden is satisfied by the IRS's "deficiency determinations and assessments for unpaid taxes," which are presumed correct "so long as they are supported by a minimal factual foundation."[11]  However, "[a] showing by the taxpayer that a determination is arbitrary, excessive or without foundation shifts the burden of proof back to the IRS."[12]  For liability determinations under 26 U.S.C. § 6672, a taxpayer may establish that an assessment or determination is without foundation by establishing that he or she (1) is not a "responsible person" (i.e., the party required to collect, truthfully account for, and pay over the tax), and (2) did not willfully refuse to pay the tax.[13]  Once the taxpayer rebuts the presumption, the burden reverts to the IRS to show that its determination was correct.[14]

---

[8]26 U.S.C. § 6672(a).

[9]*Slodov v. United States*, 436 U.S. 238, 250 (1978).

[10]*Palmer v. United States*, 116 F.3d 1309, 1312 (9th Cir. 1997) (citing *United States v. Stonehill*, 702 F.2d 1288, 1293 (9th Cir. 1983)).

[11]*Palmer*, 116 F.3d at 1312.

[12]*Id.* (citing *Helvering v. Taylor*, 293 U.S. 507, 515-16 (1935)).

[13]*U.S. v. Jones,* 33 F.3d 1137, 1139 (9th Cir. 1994).

[14]*Keogh v. Comm'r*, 713 F.2d 496, 501 (9th Cir. 1983).

Case 3:06-cv-00150-JWS   Document 83   Filed 02/09/09   Page 5 of 10

The question before the court is whether Haslett (1) is a "responsible person" (i.e., the party required to collect, truthfully account for, and pay over Winward's trust fund taxes), and (2) willfully refused to pay Winward's trust fund taxes.[15]  The government argues that Haslett was a "responsible person" under § 6672 because he was the CEO and a member of the Board of Directors of Winward's parent company, CommSpan.  Moreover, the government contends that Haslett's willfulness in refusing to pay Winward's trust fund taxes is apparent because Haslett knew that Winward was delinquent and nevertheless allowed Winward "to use unencumbered funds to pay creditors other than the United States."[16]  Because Haslett continued on as CEO of CommSpan in the face of these understood tax delinquencies, the government asserts that he should not be relieved of liability for willfully failing to pay Winward's taxes.

Haslett counters that because he was not Winward's "responsible person" at the time the decision was made to cease paying taxes or at the time the taxes were due, he is relieved of liability.  Furthermore, Haslett argues that because he directed the officers of Winward to pay its delinquent taxes, and they refused, he cannot personally be found to have acted willfully in refusing to pay Winward's trust fund taxes.  Haslett finally claims that genuine issues of material fact preclude granting summary judgment in favor of the United States because there is a dispute over whether Haslett knew of the tax liabilities at the time they arose and "the law specifically exempts a taxpayer from liability who later steps in after the fact to clean up the mess."[17]  The court addresses the parties' arguments below.

**A. Whether Haslett was Winward's "Responsible Person"**

Whether Haslett was a "responsible person" turns on his status, duty, and authority at the time the CommSpan Board of Directors and Winward's tax assessments

_____

[15] *Jones,* 33 F.3d at 1139.

[16] Docket 73 at 18.

[17] Docket 80 at 15.

became due.[18]  "Authority turns on the scope and nature of an individual's power to determine how the corporation conducts its financial affairs; the duty to ensure that withheld employment taxes are paid over flows from the authority that enables one to do so."[19]  Although an individual's day-to-day responsibilities may not include financial decision-making or tax matters, that individual may nevertheless be responsible if he or she "has the authority to pay or to order the payment of delinquent taxes."[20]  An individual becomes "responsible" under § 6672 if that person "had the authority required to exercise significant control over the corporation's financial affairs, regardless of whether he exercised such control in fact."[21]  In short, "'persons' who are 'responsible' for the payment of withholding taxes are those who 'had the final word as to what bills should or should not be paid, and when.'"[22]  Joint and several liability therefore attaches to "all those under the duty set forth in the statute."[23]

In *Slodov v. United States*,[24] the Supreme Court created an exception to § 6672 liability intended to "encourage new management to salvage failing businesses" without incurring tax liability for back taxes.[25]  If such an exception did not exist, "a well-counseled person contemplating assuming control of a financially beleaguered corporation owing back employment taxes would recognize that he could do so without incurring personal civil and criminal penalties only if there were available sufficient borrowed or personal funds fully to pay all back employment taxes before doing *any*

---

[18]*Purcell v. United States*, 1 F.3d 932, 937 (9th Cir. 1993).

[19]*Id.*

[20]*Id.*

[21]*Id.*

[22]*Id.* at 936.

[23]*Id.* at 937.

[24]*Slodov*, 436 U.S. at 252-53.

[25]*Davis v. United States*, 961 F.2d 867, 874 (9th Cir. 1992).

-7-

business."[26]  Therefore, the Court concluded, when the individual who caused the delinquency in tax payments is also a "responsible person" at the time the government attempts to collect from the employer have failed, § 6672 applies to that individual.[27] When, on the other hand, there has been a change in control of the corporation prior to the expiration of a tax quarter, or at a time when a tax delinquency for past quarters already exists, liability may not inure to the new management unless a trust has been impressed under § 7501 prior to the accession of the new "responsible person."[28]

Haslett spends much of his brief arguing that the *Slodov* exception relieves him of responsibility because he took the helm of CommSpan after the decision was made to cease paying Winward's taxes.  Although Haslett appears to have been complicit in the CommSpan Board's decision to cease paying taxes by virtue of his presence at the May 27, 2000 telephone conference, he is correct that he was not a "responsible person" at the time the June 30, 2000 tax assessment became due.  At that time, Haslett was merely a director of CommSpan and had no official role in Winward's operations and no direct control over whether payment for Winward's taxes was made. Once he assumed the role of CEO of CommSpan in September 2000, on the other hand, Haslett became the individual with "the final word" over payment of the tax assessments dated September 30, 2000 and December 31, 2001.  As CEO of CommSpan, Winward's parent company, Haslett's first order of business appears to have been negotiate an additional $700,000 line of credit for the purpose of relieving Winward's current tax deficit.  Moreover, Haslett had authority to control the financial affairs of Winward, including the administration of payroll, 401(k) contributions, and

---

[26] *Slodov*, 436 U.S. at 252-53.

[27] *Id.* at 245-46.

[28] *Id.*  Were a trust of funds collected prior to the accession of a new "responsible person" impressed under 26 U.S.C. § 7501, that individual may violate § 6672 by failing to pay over those previously collected funds.  However, § 7501 does not impress a trust on after-acquired funds, and that individual consequently does not violate § 6672 by using those funds for purposes other than the satisfaction of trust fund tax claims, as long as those funds are not directly traceable to the collected taxes.  *See Slodov*, 436 U.S. at 259-60.

-8-

union dues.[29]  Haslett even loaned CommSpan $10,000 of his personal assets to pay the interest on the line of credit that was being used to sustain Winward's operations. Haslett's argument that he did not control Winward's finances after he became CEO of CommSpan thus fails.  The court concludes, therefore, that once Haslett became CEO, he exercised significant control over the financial affairs of Winward and was among the persons responsible for the tax assessments at issue.

**B.  Whether Haslett Willfully Refused to Pay Winward's Trust Fund Taxes**

Having determined tha Haslett is a "responsible person" for the tax assessment periods ending September 30, 2000 and December 31, 2001, the remaining question is whether Haslett willfully refused to pay Winward's taxes for those periods.  "Willfulness, within the meaning of section 6672, has been defined as a voluntary, conscious and intentional act to prefer other creditors over the United States."[30]  Neither intent nor other bad motive need be proven; rather, "conduct motivated by a reasonable cause may nonetheless be willful."[31]  Where a "responsible person" understands that trust fund taxes are delinquent, and uses corporate funds to pay other expenses, Ninth Circuit precedent requires that the failure to pay withholding taxes be deemed "willful."[32]  Although such a standard may, at times, amount to imposing liability for "unwittingly" willful conduct, this proposition is long established in this circuit.[33]

Here, Haslett's conduct was not so unwitting.  It is undisputed that Haslett assumed control of CommSpan with full knowledge of the May 27, 2000 decision to cease paying Winward's trust fund taxes.  Despite his knowledge, Haslett subsequently failed to remit Winward's taxes for an additional two tax assessment periods at the

---

[29]Docket 73 at 7.

[30]*Davis v. United States*, 961 F.2d 867, 871 (9th Cir. 1992) (internal quotations omitted).

[31]*Id.* (citations omitted).

[32]*Phillips v. United States*, 73 F.3d 939, 942 (9th Cir. 1996).

[33]*Id.*

Case 3:06-cv-00150-JWS   Document 83   Filed 02/09/09   Page 9 of 10

same time he directed that corporate funds be paid out to other creditors.[34] As the Ninth Circuit has noted, "[e]very such payment 'was a voluntary, conscious and intentional act to prefer other creditors over the United States.'"[35] The court concludes therefore that Haslett willfully refused to pay Winward's taxes for the tax assessment periods ending September 30, 2000 and December 31, 2001. Haslett has failed to present any evidence or even a single cogent argument that would support a different conclusion. Haslett is therefore jointly and severally liable for the tax assessment periods ending September 30, 2000 in the amount of $407,321.20 and December 31, 2001 in the amount of $2,343.44.[36] Haslett is not, however, liable for the tax assessment period ending June 30, 2000 because, although Haslett was complicit in the decision to cease paying Winward's taxes, he was not a responsible person at that time.

## V.  CONCLUSION

For the foregoing reasons, the government's motion at docket 72 is **GRANTED** in part and **DENIED** in part, and Haslett's motion at docket 79 is **GRANTED** in part and **DENIED** in part consistent with the preceding discussion. The government shall lodge a proposed judgment for the court's consideration within 10 days from the date of this order. Haslett may file comments on the proposed judgment within 10 days from the date it is lodged.

DATED at Anchorage, Alaska, this 9th day of February 2009.


/s/ JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

---

[34]Haslett even failed to direct the funds he secured from Key Bank on September 29, 2000, which were obtained for the purpose of paying Winward's back taxes, to pay Winward's back taxes.

[35]*Purcell*, 1 F.3d at 938.

[36]Docket 82 at Exhibits B and C.

-10-